.IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHRISTOPHER T. MOORE and
TIMIRA S. RUSH,

Civil Action No. 2:23-cv-697_____

        Plaintiffs,

    v.

AUDACY SERVICES, LLC,

        Defendant.        JURY TRIAL DEMANDED

## COMPLAINT

Plaintiffs, Christopher T. Moore and Timira S. Rush, by undersigned counsel, file this Complaint and in support alleges the following.

### I. Jurisdiction

1.    The jurisdiction of this Court is invoked pursuant to Section 1 of the Civil Rights Act of 1866, 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964, U.S.C. §2000e-5(f)(3), as amended by the Civil Rights Act of 1991 and 28 U.S.C. §§1343(a)(3) and (a)(4), the Age Discrimination in Employment Act, 29 U.S.C. §626(c)(1), and 28 U.S.C. §§1331 and 1343(a)(4) and this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

### II. Venue

2.    Venue is proper in the Western District of Pennsylvania, in that this action arises out of events that occurred in the Allegheny County.

### III. Administrative Remedies

3.    Plaintiff Moore has satisfied all procedural and administrative requirements set forth in 42 U.S.C. § 2000e-5, as amended, and 42 U.S.C. §12102, *et seq*., and 29

U.S.C. §623 in that:

      a.    On or about September 12, 2022, Plaintiff Moore filed a timely charge with the Equal Employment Opportunity Commission (EEOC) alleging race and age discrimination and retaliation.

      b.    On or about September 12, 2022, Plaintiff Moore filed a timely Complaint of Discrimination with the Pennsylvania Human Relations Commission (PHRC) alleging race and age discrimination and retaliation.

      c.    Plaintiff Moore received a Notification of Dismissal from the EEOC dated February 2, 2023.

      d.    This case was filed more than 60 days after filing of the EEOC charge and within 90 days of receipt of the Notification of Dismissal.

4.    Plaintiff Rush has satisfied all procedural and administrative requirements set forth in 42 U.S.C. § 2000e-5, as amended, and 42 U.S.C. §12102, *et seq*., in that:

      a.    On or about July 1, 2022, Plaintiff Rush filed a timely charge with the Equal Employment Opportunity Commission (EEOC) alleging race discrimination, sexual harassment and retaliation and on or about December 8, 2022 Plaintiff Rush filed a timely amended charge with the EEOC alleging the same claims.

      b.    On or about July 1,2022, Plaintiff Rush filed a timely Complaint of Discrimination with the Pennsylvania Human Relations Commission (PHRC) alleging race discrimination, sexual harassment and retaliation and on or about December 8, 2022, Plaintiff Rush filed a timely Amended Complaint of Discrimination with the PHRC alleging the same claims.

      c.    Plaintiff Rush received a Notification of Dismissal from the EEOC dated April 21, 2023.

      d.    This case was filed within 90 days of receipt of the Notification of Dismissal.

## IV.  Parties

5.      Plaintiff Moore is an adult individual who resides in Allegheny County, Pennsylvania.

6.      Plaintiff Rush is an adult individual who resides in Allegheny County, Pennsylvania.

7.      Defendant, Audacy Services, LLC, owns and operates five radio stations in Pittsburgh, Pennsylvania, including KDKA-AM, a news/talk station located at Foster Plaza 5, 651 Holiday Drive, Suite 300, Pittsburgh, Pennsylvania 15220, ("KDKA-AM").

8.      At all times relevant hereto, Defendant is and was an employer within the meaning of 29 U.S.C. §630(b) and 42 U.S.C. § 2000e(b), in that it is engaged in an industry affecting interstate commerce and has the requisite minimum number of employees.

9.      At all times relevant hereto, Defendant acted or failed to act by and through its duly authorized agents, servants and employees, who conducted themselves within the scope and course of their employment.

## V.  Facts

10.     Defendant, as KDKA-AM, began operation as a commercial radio station in 1920 and was the first such station in the United States.

11.     From 1920 until November 2022 (102 years), KDKA-AM only employed one full-time African American talk show host and has maintained a workforce that has underrepresented African American employees.

**Plaintiff Moore**

12.     Since May 10, 1994, Defendant has employed Moore as a part-time radio personality and talk show host on KDKA-AM and currently, Moore serves as a part-time weekend talk show host on KDKA-AM, hosts a regular Sunday evening show (5pm-9pm), hosts a regular Saturday evening show (5pm-8pm) and performs fill-in hosting duties across virtually all dayparts (day-time slots) on an as-needed basis.

13.     Over this tenure with Defendant, spanning nearly 30 years, Moore has performed fill-in hosting duties countless times for nearly every weekday host and weekday time slot.

14.     Moore is African American and was 74 years of age at the relevant time.

15.     Moore has over fifty years of experience producing, hosting and narrating programs for radio and television, during which time he has interviewed the following notable national and local newsmakers: Bishop Desmond Tutu, Rudy Guiliani, Donald Trump, August Wilson, Mike Tyson, Ice Cube, Ice T, Harrison Ford, Kareem Abdul Jabbar, Chadwick Boseman, Pittsburgh Mayors Gainey, Peduto, Murphy and Masloff, Rich Fitzgerald, Dr. Cyril Wecht, Julius Irving, Representative Summer Lee, Harry Belafonte and Mamie Till Mobley (mother of Emmett Till).

16.     Over his career, Moore has won multiple regional Emmy Awards for his work including: "Unity of Healing – The Tree of Life Tragedy", "Wylie Avenue Days", "The Good Fight: World War II Veterans", "RX for Healthier Living" and "It Takes A Whole Village". Moore received nominations for "In Country: A Vietnam Story", "Fly Boys: Western Pennsylvania Tuskegee Airmen", "Barbershop: PA Stylin'", "Jim Crow Pennsylvania", "The House", "Hip Hop Pittsburgh", "Black Horizons" and "The Torch

Bearers". In addition, Moore was inducted into the Silver Circle Society at the February 2018 Mid-Atlantic Emmys, received the Bill Burns Award in 2013 for media excellence and won numerous local awards for his achievements and contributions to journalism in Western Pennsylvania.

17.    Despite Moore's extensive experience, numerous awards and stellar reputation in the community, Defendant has routinely hired and/or promoted less qualified Caucasian candidates into full time on-air positions while passing over Moore for promotion.

18.    Defendant has also treated Moore less favorably than his Caucasian counterparts in the terms and conditions of his employment, including but not limited to: (a) denying Moore, the only military veteran host at KDKA-AM, the opportunity to host veterans' events, while selecting non-veteran, Caucasian hosts to host the events; and (b) failing to provide Moore with assistance in promoting himself through social media platforms, while offering such assistance to Caucasian counterparts, despite making its promotion decisions in part by selecting those with a strong social media presence.

19.    Moore, in an effort to be promoted, privately hired a social media digital content specialist so he could gain a stronger social media presence.

20.    Over the following months, Moore, Rush and Hayes-Freeland met with Graci, Spacciapolli and Anderson to discuss their concerns.

21.    On September 17, 2020, Moore emailed Graci, Spacciapolli and Anderson his interest in a position as a full-time weekday host in light of their prior discussions regarding contemplated talent lineup changes.

22.    In October 2020, Defendant was forced to terminate full-time host Wendy

Bell for her consistently racially offensive and inflammatory on-air comments.

23.    Moore was never made aware of an application or audition process to be considered to replace Bell.

24.    Moore filled-in for Bell's former slot several times but Defendant failed to hire him to replace Bell.

25.    Rather, on December 1, 2020, Defendant hired a significantly younger Caucasian who had only briefly worked for Defendant as a fill-in host and had little on-air radio experience.

26.    Moore engaged in further protected activity when he complained to Graci, Spacciapolli and Anderson regarding the above hiring.

27.    In response, Graci emailed Moore that Moore had not been considered to replace Bell because he had not applied.

28.    Graci's statement, however, was contradicted by another part of the above email chain, where Spacciapolli emailed Graci a reminder that Graci listened to Moore's daytime on-air fill-in work over the prior 30-45 days, which indicated that Defendant had actually considered Moore to be Bell's replacement:  "And Jim [Graci], you may be able to share [with Moore] that all of the pm drive shifts you gave [Moore] over the past 30-45 days were so you could hear [Moore] in the daypart [daytime shifts]."

29.    The following year, Defendant announced on September 3, 2021 that Hayes-Freeland (the only African American full-time host KDKA-AM had ever employed) would be leaving Defendant in November 2021, thereby opening up another full-time weekday host position.

30.    That same day, Moore immediately expressed interest in the position by

6

emailing Spacciapolli his interest.

31.    In response, Spacciapolli emailed Moore, "Glad to hear you are interested in the spot. when (sic) we get to the point of on air auditions and such we will let you know. And we will share the posting when the posting goes up. Thank you for all you are doing here, I appreciate it."

32.    On October 26, 2021, Moore also emailed Corrie Jacob, Business Administrator, his interest in being considered to be the replacement for the Hayes-Freeland position.

33.    In response, Jacob emailed Moore, "As soon as we post the job I will let everyone know."

34.    On November 12, 2021, Moore followed up his interest in the Hayes-Freeland position by emailing Spacciapolli, Jacob and PJ Kumanchik, News Director, the following:

> "I hear Lynne Hayes Freeland announcing today Friday, November 12th that this is her last regular weekday show. With that knowledge in hand, I have NOT heard anything about the stations' plan to replace her. I know that I'm filling in for her three days next week, but I assume that is because of the Thanksgiving holidays. Have you collectively made any plans to fill her position? I just want to know what the process will be and how I might effectively compete for the position."

35.    In response, Jacob emailed Moore thanking him for "reaching out" and "We have not made any decisions about filling Lynne's position nor have we posted the position."

36.    On January 26, 2022, Moore again expressed interest in the position by emailing his continued interest to Spacciapolli and Dave Labrozzi, Brand Manager.

37.    In response, Spacciapolli emailed Moore, "We have not made any decision

on noon to 3 nor have we even finalized if that will be a show time moving forward."

38.     Moore would have been a natural choice to replace Hayes-Freeland given his long-time employment with Defendant, his extensive on-air radio experience, his proven track record and his name recognition and support within the radio-listening community.

39.     On June 13, 2022, Moore engaged in further protected activity by having his legal counsel notify Defendant that Moore believed Defendant's refusal to hire him to replace Hayes-Freeland was racially discriminatory and retaliatory.

40.     On August 19, 2022, Defendant announced that Paul Ziese, a significantly younger, less experienced African American, who did not engage in protected activity, was hired to replace Hayes-Freeland.

41.     On September 12, 2022, Moore engaged in further protected activity by filing a complaint of race/age discrimination and retaliation with the Equal Employment Opportunity Commission and the Pennsylvania Human Relations Commission.

**Plaintiff Rush**

42.     Since August 1996, Defendant has employed Rush as a producer for KDKA-AM.

43.     During her tenure with Defendant, spanning over 30 years, Rush produced innumerable successful talk show programs on KDKA-AM, won numerous awards as a producer, trained numerous producers that have moved on to competing stations and are working as successful on-air talent and has been noted for her loyalty, dedication and commitment to Defendant.

44.     Rush is African American and a female.

45.     During the course of her employment, KDKA-AM has followed a practice of affording opportunities to other producers to appear as "on-air talent", thereby providing those producers with a pathway to become talk show hosts.

46.     Rush started a union for the first time in the history of KDKA-AM so that producers could get an opportunity to move to on-air talent positions and increase their earnings.

47.     While KDKA-AM has followed the above practice with respect to Caucasian (and predominantly male) producers/employees, Rush has not been provided those same opportunities, despite being more experienced and more qualified than her similarly situated Caucasian counterparts.

48.     In addition to being denied on-air opportunities, KDKA-AM routinely overlooked Rush's accomplishments, while praising, recognizing, and otherwise rewarding similarly situated Caucasian producers for their inferior work product.

49.     The racially disparate treatment that Rush experienced occurred in the context of a major metropolitan radio station where she was the only African American producer and one of three full-time African American employees out of a local work force in excess of 50 employees.

50.     Rush regularly observed disparate treatment of the other African American employees, including not affording those employees opportunities otherwise afforded to less experienced and qualified similarly situated Caucasian employees.

51.     Rush's objections to the disparate treatment to which she and other African American employees were subjected, went unheeded.

52.    Examples of the disparate treatment include:

a.    Craig Reilly, a similarly situated Caucasian male producer, who received innumerable on air talk show host opportunities since in or about 2020;

b.    Bill Steinbach, a similarly situated Caucasian male producer, who moved to on-air talent/traffic reporter position in or about 2021;

c.    Andrew Limberg, a similarly situated Caucasian male producer, who moved to an on-air talent/news anchor position on January 13, 2022;

d.    Ben Cominos, a similarly situated Caucasian male producer, who received innumerable on-air talk show host opportunities and eventually moved to an on-air talent position on February 6, 2022; and

e.    The practice of using soundbites from Caucasian produced/posted talk shows and refusing to use soundbites from talk shows produced by Rush or from shows having by an African American host.

53.    From June 2020 to May 2021, Rush and Hayes-Freeland had numerous conversations with Graci and Kumanchik about racism in the newsroom including, but not limited to, refusal to use their clips during KDKA's news programming.

54.    On June 8, 2020, then-News Editor Jennifer Bloodworth, a Caucasian, wrote a letter of resignation to Defendant's CEO David Field and in her resignation letter, referenced Defendant's racially discriminatory actions.

55.    On June 18, 2020, Rush, Moore and Hayes-Freeland engaged in protected activity by emailing a complaint to Graci, Spacciapolli and Anderson regarding Defendant's failure to recognize the contributions of African American employees and to include African American perspectives in its on-air content.

56.    Over the following months, Rush, Moore and Hayes-Freeland met with Graci and Anderson to discuss their concerns regarding the issues raised in their June 18, 2020 email, above.

57.    Rush, however, continued to be denied the opportunity for experience as on-air talent.

58.    In May 2021, Rush participated in a weekly Zoom meeting with Graci, Kumanchik, Anderson and Hayes-Freeland, where one of the topics being discussed was ongoing racial discrimination in the newsroom.

59.    During this Zoom meeting, Graci asked Rush whether she had a problem with him.

60.    In response, Rush stated that she did have a problem with Graci because of a sexual harassment incident occurring in December 2019, where Graci kissed Rush on the mouth without her consent at a holiday party, causing her extreme emotional distress.

61.    Rush did not report the incident at the time because she perceived Graci to be a high level and influential supervisor.

62.    One of the participants at the Zoom meeting reported the incident to Defendant's Human Resources department.

63.    On June 9, 2021, Rush had a phone call with Lisa Morton, Defendant's Human Resources Manager, regarding the December 18, 2019 sexual harassment incident by Graci.

64.    Defendant investigated Rush's allegation and on August 9, 2021, Defendant terminated Graci.

65.    On October 5, 2021, during a breakfast meeting with Spacciapolli that Rush requested, she informed Spacciapolli of her interest in being on-air talent on the Programming side, given Defendant's history of providing producers an opportunity to

progressively move up to the position of on-air talent, a higher paying position.

66.    In November 2021, Rush had a meeting with Brand Manager David Labrozzi in his office regarding these same opportunities to moving to an on-air talent position that had been afforded to Caucasian males.

67.    Labrozzi informed Rush on numerous occasions, including a day in December 2021 in the presence of Ben Cominos, a similarly situated Caucasian male producer, that he would "see to making it happen."

68.    On or about January 4, 2022, upon her return from a holiday break, Labrozzi told Rush that he had not forgotten about her and for her not to worry.

69.    On January 28, 2022, Rush received an email from her union representative that management reached out to him regarding the decision to move producer Ben Cominos, a similarly situated Caucasian male producer, whom Rush trained, with only three years of experience with Defendant, to an on-air talent position.

70.    The above email caused Rush to suffer an emotional breakdown.

71.    Given Rush's extreme emotional distress from Defendant's decision to pass her over again for an opportunity to have experience becoming on-air talent, Rush was forced to take a medical leave of absence beginning on February 1, 2022 so that she could address her mental health.

72.    On February 9, 2022 Spacciapolli emailed a monthly newsletter to the Pittsburgh team about the following Caucasian males:

  a.    Andy Limberg making his inaugural appearance on KDKA-AM delivering news and traffic during January 2022;

  b.    and Bill Steinbach making his inaugural appearances on KDKA-AM delivering news and traffic during January 2022; and

12

   c. Ben Cominos debuting as a talk show host on February 6, 2022 to rave reviews while displaying great promise which would afford him more such opportunities in the coming weeks.

73. On July 11, 2022, Rush returned from her medical leave of absence.

74. Although terminated employees are not allowed to enter the KDKA-AM studio, Graci was present on the premises on July 15, 2022, and Rush witnessed Graci walking past her booth and interacting with Kumanchik.

75. Rush was immediately concerned for her safety because Graci knew that her sexual harassment complaint was the reason he was terminated.

76. Kumanchik knew that Graci had been terminated for kissing Rush without her consent and that he was not allowed on the premises as a result.

77. He also knew that Rush had returned from a medical leave of absence just a few days before.

78. Kumanchik had the authority to tell Graci to leave, but failed to do so.

79. Rush also discovered that other employees had been told that Rush's complaint against Graci was the reason for his termination.

80. Defendant's lack of concern for her safety and well-being compounded the emotional distress Rush was already experiencing and created a hostile work environment which was intolerable for Rush.

81. Rush was forced to take another medical leave of absence on July 15, 2022 per her physician's advice, due to her physical and emotional devastation on seeing Graci at work.

### Count I – Race Discrimination
### Civil Rights Act of 1866
### 42 U.S.C. § 1981

82.     Plaintiffs incorporate paragraphs 1 through 81 as though the same had been fully set forth at length herein.

83.     Defendant failed to promote Moore because of his race.

84.     Defendant's failure to promote Moore because of his race deprived Moore of the same right to make and enforce contracts as is enjoyed by white citizens in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

85.     Defendant's failure to promote Moore was undertaken with reckless indifference to Plaintiff's federally protected right to make and enforce contracts irrespective of his race.

86.     As a direct and proximate result of Defendant's illegal treatment, Moore suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment against Defendant pursuant to 42 U.S.C. § 1981 as follows:

   a.   That Defendant be ordered to place Moore into the position he should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

   b.   That Defendant be required to compensate Moore for the full value of wages he would have received had it not been for Defendant's illegal treatment of Moore, with interest until the date Moore is offered employment as a full-time on-air host;

c.     That Defendant be required to provide Moore with front pay if the Court determines placing Moore in a full-time on-air host position is not feasible;

d.     That Defendant be required to compensate Moore for lost benefits, including profit sharing and/or pension benefits until Moore's expected retirement date;

e.     That Moore be awarded compensatory damages in an amount to be determined at trial;

f.     That Moore be awarded punitive damages in an amount to be determined at trial;

g.     That Defendant be enjoined from discriminating or retaliating against Moore in any manner prohibited by Section 1981;

h.     That Moore be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

i.     That Moore be granted such further legal and equitable relief as the Court may deem just and proper.

**Count II – Race Retaliation**
**Civil Rights Act of 1866**
**42 U.S.C. § 1981**

87.    Plaintiffs incorporate paragraphs 1 through 86 as though the same had been fully set forth at length herein.

88.    Defendant failed to promote Moore because of his protected activity.

89.    Defendant's failure to promote Moore because of his protected activity deprived Moore of the same right to make and enforce contracts as is enjoyed by white citizens in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

90.    Defendant's failure to promote Moore was undertaken with reckless indifference to Plaintiff's federally protected right to make and enforce contracts irrespective of his race.

15

91.    As a direct and proximate result of Defendant's illegal treatment, Moore suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment against Defendant pursuant to 42 U.S.C. § 1981 as follows:

a.    That Defendant be ordered to place Moore into the position he should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.    That Defendant be required to compensate Moore for the full value of wages he would have received had it not been for Defendant's illegal treatment of Moore, with interest until the date Moore is offered employment as a full-time on-air host;

c.    That Defendant be required to provide Moore with front pay if the Court determines placing Moore in a full-time on-air host position is not feasible;

d.    That Defendant be required to compensate Moore for lost benefits, including profit sharing and/or pension benefits until Moore's expected retirement date;

e.    That Moore be awarded compensatory damages in an amount to be determined at trial;

f.    That Moore be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Moore in any manner prohibited by Section 1981;

h.    That Moore be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

       i.       That Moore be granted such further legal and equitable relief as the Court may deem just and proper.

## Count III – Race Discrimination
## Title VII of the Civil Rights Act of 1964, as amended
## 42 U.S.C. 2000e

92.     Plaintiffs incorporate paragraphs 1 through 91 as though the same had been fully set forth at length herein.

93.     Defendant failed to promote Moore because of his race, African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

94.     Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

95.     As a direct and proximate result of Defendant's illegal discrimination, Moore suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

      a.     That Defendant be ordered to place Moore into the position he should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

      b.     That Defendant be required to compensate Moore for the full value of wages he would have received had it not been for Defendant's illegal treatment of Moore, with interest until the date Moore is offered employment as a full-time on-air host;

      c.     That Defendant be required to provide Moore with front

pay if the Court determines placing Moore in a full-time on-air host position is not feasible;

d.    That Defendant be required to compensate Moore for lost benefits, including profit sharing and/or pension benefits until Moore's expected retirement date;

e.    That Moore be awarded compensatory damages in an amount to be determined at trial;

f.    That Moore be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Moore in any manner prohibited by Section 1981;

h.    That Moore be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee;

i.    That Moore be granted such further legal and equitable relief as the Court may deem just and proper.

## Count IV – Race Retaliation
### Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. 2000e

96.    Plaintiffs incorporate paragraphs 1 through 95 as though the same had been fully set forth at length herein.

97.    Moore opposed racially discriminatory hiring decisions, which he in reasonably good faith believed was illegal conduct under federal and state anti-discrimination laws.

98.    Moore complained about the racially discriminatory hiring decisions to Defendant.

99.    Defendant ignored Moore's complaints of race discrimination.

100.    Defendant refused to promote Moore in retaliation for his protected activity.

101.    Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

102.    As a direct and proximate result of Defendant's illegal retaliation, Moore suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.    That Defendant be ordered to place Moore into the position he should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.    That Defendant be required to compensate Moore for the full value of wages he would have received had it not been for Defendant's illegal treatment of Moore, with interest until the date Moore is offered employment as a full-time on-air host;

c.    That Defendant be required to provide Moore with front pay if the Court determines placing Moore in a full-time on-air host position is not feasible;

d.    That Defendant be required to compensate Moore for lost benefits, including profit sharing and/or pension benefits until Moore's expected retirement date;

e.    That Moore be awarded compensatory damages in an amount to be determined at trial;

f.    That Moore be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Moore in any manner prohibited by Section 1981;

h.   That Moore be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee;

i.   That Moore be granted such further legal and equitable relief as the Court may deem just and proper.

## Count V – Age Discrimination
## Age Discrimination in Employment Act
## 29 U.S.C. 623, et seq.

103.   Plaintiffs incorporate paragraphs 1 through 102 as though the same had been fully set forth at length herein.

104.   Defendant failed to promote Moore because of his age, 74, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §623(a)(1).

105.   Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

106.   Defendant's violation of the ADEA was willful.

107.   As a direct and proximate result of Defendant's illegal discrimination, Plaintiff suffered a loss of income and fringe benefits, and lost career opportunities.

WHEREFORE, Plaintiff demands judgment as follows:

a.   That Defendant be ordered to place Moore into the position he should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.   That Defendant be required to compensate Moore for the full value of wages he would have received had it not been for Defendant's illegal treatment of Moore, with interest until the date Moore is offered employment as a full-time on-air host;

c.   That Defendant be required to provide Moore with front pay if the Court determines placing Moore in a full-time on-air host position is not feasible;

d.      That Defendant be required to compensate Moore for lost benefits, including profit sharing and/or pension benefits until Moore's expected retirement date;

e.      That a final judgment in favor of Plaintiff and against Defendant be entered for liquidated damages in an amount equal to the amount of wages due and owing Plaintiff as provided by 29 U.S.C. §626(b) and 216(b);

f.      That Defendant be enjoined from discriminating or retaliating against Moore in any manner prohibited by the ADEA;

g.      That Moore be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee;

h.      That Moore be granted such further legal and equitable relief as the Court may deem just and proper.

### Count VI – Race Discrimination
### Civil Rights Act of 1866
### 42 U.S.C. § 1981

108.    Plaintiffs incorporate paragraphs 1 through 107 as though the same had been fully set forth at length herein.

109.    Defendant failed to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position because of her race.

110.    Defendant's failure provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position because of her race deprived Rush of the same right to make and enforce contracts as is enjoyed by white citizens in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

111.    Defendant's failure to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position was undertaken with reckless indifference to Plaintiff's federally protected right to make and enforce contracts

irrespective of her race.

112.    As a direct and proximate result of Defendant's illegal treatment, Rush suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment against Defendant pursuant to 42 U.S.C. § 1981 as follows:

a.    That Defendant be ordered to place Rush into the position she should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.    That Defendant be required to compensate Rush for the full value of wages she would have received had it not been for Defendant's illegal treatment of Rush, with interest until the date Rush is offered opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position;

c.    That Defendant be required to provide Rush with front pay if the Court determines providing Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position is not feasible;

d.    That Defendant be required to compensate Rush for lost benefits, including profit sharing and/or pension benefits until Rush's expected retirement date;

e.    That Rush be awarded compensatory damages in an amount to be determined at trial;

f.    That Rush be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Rush in any manner prohibited by Section 1981;

h.    That Rush be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

i.    That Rush be granted such further legal and equitable relief as the Court may deem just and proper.

### Count VII – Race Retaliation
### Civil Rights Act of 1866
### 42 U.S.C. § 1981

113.   Plaintiffs incorporate paragraphs 1 through 112 as though the same had been fully set forth at length herein.

114.   Defendant failed to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position because of her protected activity.

115.   Defendant's failure to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position because of her protected activity deprived Moore of the same right to make and enforce contracts as is enjoyed by white citizens in violation of the Civil Rights Act of 1866, 42 U.S.C. §1981.

116.   Defendant's failure to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position was undertaken with reckless indifference to Plaintiff's federally protected right to make and enforce contracts irrespective of her race.

117.   As a direct and proximate result of Defendant's illegal treatment, Rush suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment against Defendant pursuant to 42 U.S.C. § 1981 as follows:

a.    That Defendant be ordered to place Rush into the position she should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.    That Defendant be required to compensate Rush for the full value of wages she would have received had it not been for Defendant's illegal treatment of Rush, with interest until the date Rush is offered opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position;

c.    That Defendant be required to provide Rush with front pay if the Court determines providing Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position is not feasible;

d.    That Defendant be required to compensate Rush for lost benefits, including profit sharing and/or pension benefits until Rush's expected retirement date;

e.    That Rush be awarded compensatory damages in an amount to be determined at trial;

f.    That Rush be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Rush in any manner prohibited by Section 1981;

h.    That Rush be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

i.    That Rush be granted such further legal and equitable relief as the Court may deem just and proper.

### Count VIII – Race Discrimination
### Title VII of the Civil Rights Act of 1964, as amended
### 42 U.S.C. 2000e

118.    Plaintiffs incorporate paragraphs 1 through 117 as though the same had been fully set forth at length herein.

119.    Defendant failed to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position because of her race, African American, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991.

120.    Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

121.    As a direct and proximate result of Defendant's illegal discrimination, Rush suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.    That Defendant be ordered to place Rush into the position she should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.    That Defendant be required to compensate Rush for the full value of wages she would have received had it not been for Defendant's illegal treatment of Rush, with interest until the date Rush is offered opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position;

c.    That Defendant be required to provide Rush with front pay if the Court determines providing Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position is not feasible;

d.    That Defendant be required to compensate Rush for lost benefits, including profit sharing and/or pension benefits until Rush's expected retirement date;

e.    That Rush be awarded compensatory damages in an amount to be determined at trial;

f.    That Rush be awarded punitive damages in an amount to be determined at trial;

g.    That Defendant be enjoined from discriminating or retaliating against Rush in any manner prohibited by Section 1981;

h.    That Rush be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

i.    That Rush be granted such further legal and equitable relief as the Court may deem just and proper.

**Count IX – Race Retaliation**
**Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. 2000e**

122.    Plaintiffs incorporate paragraphs 1 through 121 as though the same had been fully set forth at length herein.

123.    Rush opposed racially discriminatory hiring decisions, which she in reasonably good faith believed was illegal conduct under federal and state anti-discrimination laws.

124.    Rush complained about the racially discriminatory hiring decisions to Defendant.

125.    Defendant ignored Rush's complaints of race discrimination.

126.    Defendant refused to provide Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position in retaliation for her protected activity.

127.    Defendant's actions were taken with malice or reckless indifference to Plaintiff's federally protected rights.

26

128.   As a direct and proximate result of Defendant's illegal retaliation, Rush suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.   That Defendant be ordered to place Rush into the position she should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.   That Defendant be required to compensate Rush for the full value of wages she would have received had it not been for Defendant's illegal treatment of Rush, with interest until the date Rush is offered opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position;

c.   That Defendant be required to provide Rush with front pay if the Court determines providing Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position is not feasible;

d.   That Defendant be required to compensate Rush for lost benefits, including profit sharing and/or pension benefits until Rush's expected retirement date;

e.   That Rush be awarded compensatory damages in an amount to be determined at trial;

f.   That Rush be awarded punitive damages in an amount to be determined at trial;

g.   That Defendant be enjoined from discriminating or retaliating against Rush in any manner prohibited by Section 1981;

h.   That Rush be awarded against Defendant the costs and expenses of this litigation, including a reasonable

attorney's fee; and

i.    That Rush be granted such further legal and equitable
      relief as the Court may deem just and proper.

**Count X – Sexual Harassment**
**Title VII of the Civil Rights Act of 1964, as amended**
**42 U.S.C. 2000e**

129.    Plaintiffs incorporate paragraphs 1 through 128 as though the same had been fully set forth at length herein.

130.    Defendant's actions directed to Plaintiff created a sexually hostile work environment.

131.    The sexual harassment of Plaintiff was intentional and offensive to her because of her sex, female.

132.    The sexual harassment of Plaintiff was severe or pervasive.

133.    The sexual harassment, through Defendant's agents, servants, and employees, detrimentally affected Plaintiff.

134.    Defendant's actions, through its agents and servants, as set forth above, would detrimentally affect a reasonable individual in Plaintiff's position.

135.    Defendant either knew or should have known of the existence of a sexually hostile environment.

136.    Despite such knowledge, Defendant failed to take prompt and adequate remedial action to prevent and to stop the conduct.

137.    Defendant's actions affected Plaintiff in the terms and conditions of her employment because of her sex, female, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

138.    Defendant acted intentionally and in reckless indifference to Plaintiff's

28

federally protected right to not be subjected to unwelcome and unwanted conduct of a sexual nature.

139.    As a direct and proximate result of Defendant's illegal harassment, Plaintiff suffered severe humiliation, inconvenience, mental distress, embarrassment, and like conditions as well as a loss of income and fringe benefits, loss of reputation and lost career opportunities.

WHEREFORE, Plaintiff demands judgment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended by the Civil Rights Act of 1991 as follows:

a.      That Defendant be ordered to place Rush into the position she should have had but for Defendant's discriminatory actions, together with all benefits incident thereto, including, but not limited to wages, benefits, training and seniority;

b.      That Defendant be required to compensate Rush for the full value of wages she would have received had it not been for Defendant's illegal treatment of Rush, with interest until the date Rush is offered opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position;

c.      That Defendant be required to provide Rush with front pay if the Court determines providing Rush with opportunities to appear as "on-air talent" so as to later qualify for an "on-air talent" position is not feasible;

d.      That Defendant be required to compensate Rush for lost benefits, including profit sharing and/or pension benefits until Rush's expected retirement date;

e.      That Rush be awarded compensatory damages in an amount to be determined at trial;

f.      That Rush be awarded punitive damages in an amount to be determined at trial;

g.      That Defendant be enjoined from discriminating or retaliating against Rush in any manner prohibited by

Section 1981;

h.   That Rush be awarded against Defendant the costs and expenses of this litigation, including a reasonable attorney's fee; and

i.   That Rush be granted such further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted:

*/s/ Colleen E. Ramage*
Colleen E. Ramage
PA I.D. No. 64413

Nikki Velisaris Lykos
PA I.D. No. 204813

Ramage Lykos, LLC
525 William Penn Place
28th Floor
Pittsburgh, PA  15219
(412) 325-7700

cramage@ramagelykos.law
nlykos@ramagelykos.law

Attorneys for Plaintiffs
Christopher T. Moore and
Timira Rush